PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

     *Plaintiff-Appellant,*

v.

PAUL WILKINSON,

     *Defendant-Appellee.*

No. 09-4018

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(1:07-cr-00570-WMN-2)

Argued: October 29, 2009

Decided: January 4, 2010

Before SHEDD, Circuit Judge, HAMILTON, Senior Circuit
Judge, and Norman K. MOON, United States District Judge
for the Western District of Virginia, sitting by designation.

Vacated and remanded by published opinion. Senior Judge
Hamilton wrote the opinion, in which Judge Shedd joined.
Judge Moon wrote a separate opinion concurring in part and
dissenting in part.

## COUNSEL

**ARGUED**: Nickolai Gilford Levin, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appel-

lant. Gordon Mehler, LAW OFFICE OF GORDON
MEHLER, PLLC, New York, New York, for Appellee. **ON
BRIEF:** Scott D. Hammond, Acting Assistant Attorney General; Mark W. Pletcher, John F. Terzaken, Portia R. Brown,
John J. Powers, III, UNITED STATES DEPARTMENT OF
JUSTICE, Antitrust Division, Washington, D.C., for Appellant. Rebecca Stack Campbell, LAW OFFICE OF GORDON
MEHLER, PLLC, New York, New York, for Appellee.

---

**OPINION**

HAMILTON, Senior Circuit Judge:

In this appeal, the government challenges the probationary
sentence of Paul Wilkinson (Wilkinson) in connection with
his guilty plea to various fraud charges stemming from his
participation in a government procurement fraud scheme
involving aviation fuel contracts. The government also challenges the district court's failure to award the Defense Energy
Support Center (DESC) $592,922.00 in restitution under the
Mandatory Victims Restitution Act of 1996 (the MVRA), 18
U.S.C. §§ 3663A-3664. For reasons that follow, we vacate
Wilkinson's sentence and remand with instructions for: (1)
resentencing; and (2) reconsideration of the district court's
determination that DESC was entitled to no restitution under
the MVRA.

I.

A.    Charges and Guilty Plea.

On December 5, 2007, a federal grand jury sitting in the
District of Maryland indicted Wilkinson on one count of conspiracy to defraud the United States (Count I), 18 U.S.C.
§ 371, one count of conspiracy to commit wire fraud (Count
II), *id.* § 1349, and one count of conspiracy to steal trade

secrets (Count III), *id.* § 1832(a)(5). Pursuant to a plea agreement (the Plea Agreement), on July 29, 2008, Wilkinson pled guilty to Counts I, II, and III, as charged in the indictment. The Plea Agreement incorporated the allegations contained in the indictment by reference, which allegations Wilkinson "knowingly, voluntarily, and truthfully" admitted as fact. (J.A. 28). The Plea Agreement also specified that the parties would "contest the amount of loss intended or occasioned by [Wilkinson's offense] conduct, and thus leave to the judgment of the Court the appropriate Guidelines enhancement under U.S.S.G. § 2B1.1(b)(1)," (J.A. 30-31), and that the government "w[ould] not argue that the loss results in more than an eighteen-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(J)." (J.A. 31). Additionally, Wilkinson agreed "to the entry of a restitution order for the full amount of the victims' actual losses pursuant to" the MVRA, "as determined by the Court at sentencing." (J.A. 32).

B.  Facts of Wilkinson's Offense Conduct Relevant to the Issues on Appeal.

DESC, a logistics agency of the United States Department of Defense, is responsible for procuring into-plane and posts, camps, and stations (PC&S) aviation fuel supply contracts to service United States military and civilian activities throughout the world. In carrying out this responsibility, DESC conducts a full and open, multi-stage, competitive procurement process with respect to each contract. Competing offerors submit initial bids by a given date, which bids are then reviewed by DESC. Subsequently, competing offerors are permitted to submit best and final bids by a given date. To ensure fairness in the bidding process, competing offerors are not permitted to share initial or best and final bid information.

Wilkinson's convictions in this case stem from his criminal activities with respect to three aviation fuel supply contracts awarded by DESC—two into-plane contracts and one PC&S contract. In general, a single DESC into-plane solicitation will

contain line items for numerous airports within a broad geographical area, but offerors are not required to submit an offer with respect to each airport. Rather, each airport may be awarded as a separate contract or, where a single offeror is awarded multiple airports from the same solicitation, a single contract for all such locations is awarded. DESC awards PC&S contracts for delivery of aviation fuel into authorized storage facilities at destinations world wide.

Prior to DESC's issuances of the three bid solicitations involved in this case, Wilkinson and Christopher Cartwright (Cartwright) had co-founded Far East Russia Aircraft Services (FERAS) and Aerocontrol, Ltd. (Aerocontrol). The pair served as managing co-directors of each company, are citizens of the United States, and, at all times relevant to this case, resided in the Czech Republic. For ease of reference, we will treat FERAS and Aerocontrol as a single entity and refer to it as FERAS/Aerocontrol.

Beginning in February 2005, Wilkinson and Cartwright entered into a consultancy agreement (the Consultancy Agreement) with Matthew Bittenbender (Bittenbender), an employee of FERAS/Aerocontrol's direct competitor Avcard, LLC (Avcard), whereby Bittenbender would secretively feed them Avcard's confidential bid information for various into-plane and PC&S aviation fuel solicitations in exchange for money.[1] Bittenbender had easy access to such information, because one of his primary job responsibilities for Avcard was to prepare Avcard's bid packages for submission to DESC. The Consultancy Agreement provided that, with

---

[1]The indictment in this case charged Cartwright as a codefendant with respect to Counts I, II, and III. Pursuant to a plea agreement, Cartwright pled guilty to Count II (the count alleging conspiracy to commit wire fraud) and the remaining counts against him were dismissed. The district court sentenced Cartwright to three years' probation and 500 hours of community service. Because Cartwright is not a party to the present appeal, our remaining recitation of the facts will focus only upon Wilkinson's conduct.

respect to every into-plane location that FERAS/Aerocontrol's bid would win through the aid of Bittenbender, Wilkinson would pay Bittenbender a flat fee, plus ten percent commission on the profits. With respect to any PC&S aviation fuel contract that FERAS/Aerocontrol would win through the aid of Bittenbender, the Consultancy Agreement provided that Wilkinson would pay Bittenbender a percentage of the fuel sales.

DESC issued the first bid solicitation at issue in February 2005 (Bid Solicitation One). Bid Solicitation One pertained to into-plane aviation fuel supply with respect to 109 airports throughout Asia and Eastern Europe. After an amendment changed the initial due date, DESC required initial bids to be submitted on April 11, 2005, and required best and final bids with respect to some airports to be submitted on or around the first week of August 2005. Ultimately, DESC awarded FERAS/Aerocontrol into-plane aviation fuel supply contracts for seven locations under Bid Solicitation One.

The second bid solicitation at issue was issued in May 2005, when DESC re-opened a bid solicitation for an into-plane aviation fuel supply contract with respect to an airport in Baku, Azerbaijan (Bid Solicitation Two). DESC awarded the corresponding contract to FERAS/Aerocontrol on or around May 10, 2005.

On or about June 16, 2005, DESC issued the third bid solicitation at issue—one for a PC&S aviation fuel supply contract with respect to Bagram Air Field, Afghanistan (Bid Solicitation Three). DESC originally required initial bids to be submitted by July 1, 2005, but subsequently postponed the deadline to March 31, 2006. Best and final bids were due by July 13, 2006. On August 16, 2006, DESC awarded the corresponding contract to a company unaffiliated with FERAS/Aerocontrol named Red Star. FERAS/Aerocontrol had withdrawn from the bidding process prior to the final award.

With respect to Bid Solicitations One, Two, and Three, Bittenbender fed Wilkinson confidential information regarding Avcard's participation in the bidding process. Wilkinson knowingly and willfully accepted such information with the intent to gain unfair advantages for FERAS/Aerocontrol in the respective bidding processes.[2]

C.     Sentencing.

Upon accepting Wilkinson's guilty plea to Counts I, II, and III, the district court ordered the United States Probation Office to prepare a Presentence Report (the PSR) for Wilkinson. The PSR submitted in response specified: (1) a base offense level of 7 under the United States Sentencing Commission, *Guidelines Manual*, (Nov. 2007) (USSG or the Guidelines),[3] *see* USSG § 2B1.1(a)(1); (2) an 18 level enhancement on the basis that the loss in this case was at least $2,500,000.00, *see id.* § 2B1.1(b)(1)(J); (3) a 2 level enhancement because a substantial part of Wilkinson's offense conduct was committed from outside the United States, *see id.* § 2B1.1(b)(9)(B); (4) a 2 level reduction for acceptance of responsibility, *see id.* § 3E1.1(a); and (5) an additional 1 level reduction for acceptance of responsibility, in anticipation of a motion by the government to that effect, as agreed upon in the Plea Agreement, *see id.* § 3E1.1(b). All of this resulted in a total offense level of 24. When combined with Wilkinson's criminal history category of I, an offense level of 24 produced an advisory Guidelines sentencing range of 51 to 63 months' imprisonment. Additionally, the PSR stated that, pursuant to 18 U.S.C. § 3561(c)(1), Wilkinson was eligible for not less than 1 nor more than 5 years' probation. However, the PSR

---

[2]Notably, with respect to Bid Solicitation Two, the confidential bid information that Bittenbender fed Wilkinson enabled FERAS/Aerocontrol not only to underbid Avcard and win the contract, but also increase its profit margin.

[3]The Plea Agreement specifies that the November 1, 2007 edition of the Guidelines apply in sentencing Wilkinson.

also stated that because the applicable advisory Guidelines sentencing range was in Zone D of the Sentencing Table, Wilkinson was actually ineligible for probation. *See* USSG § 5B1.1, comment. (n.2); USSG § 5C1.1(f).

Wilkinson was originally scheduled to be sentenced on October 30, 2008. Ultimately, he was sentenced on November 26, 2008, following a two-day sentencing hearing. Prior to such hearing, on October 20, 2008, the government submitted its initial sentencing memorandum to the district court, requesting that the district court sentence Wilkinson to 51 months' imprisonment, the low end of the advisory Guidelines sentencing range recommended in the PSR. With respect to restitution due Avcard under the MVRA, the government submitted that Avcard was due $286,236.00 ($40,927.00 for its loss of Bittenbender's honest services and the balance for its losses from DESC contracts not awarded to it because of Wilkinson's offense conduct).[4] With respect to restitution due DESC under the MVRA, the government submitted that DESC was due $592,922.00 ($26,813.00 for loss to DESC from administrative costs in resoliciting and reawarding the contracts tainted by Wilkinson's offense conduct; $91,423.00 for loss to DESC from higher spot fuel purchases; and $474,686.00 for loss to DESC from higher contract prices on the reawarded contracts). The government's sentencing memoranda had three attachments in the form of tables that pertained to the government's actual pecuniary loss calculations with respect to DESC. Table 1 was entitled "Loss to DESC in Administrative Costs." (J.A. 65). Table 2 was entitled "Loss to DESC from Higher Spot Prices." (J.A. 66). Table 3 was entitled "Loss to DESC from Higher Contract Prices." (J.A. 67).

On October 20, 2008, Wilkinson submitted his initial sen-

---

[4]The $40,927.00 figure represented the prorated portion of Bittenbender's $54,569.00 annual salary over the nine months' duration of Wilkinson's offense conduct.

tencing memorandum to the district court, seeking a non-Guidelines sentence to be no greater than that to be given Cartwright, who was already scheduled to be and was sentenced just nine days later on October 29, 2008. By the time Wilkinson submitted his response to the government's initial sentencing memorandum on November 20, 2008, Wilkinson took the position that his advisory Guidelines sentencing range should be 10 to 16 months' imprisonment, based on an intended loss to Avcard of $39,741.00, and that he should nonetheless receive the same non-Guidelines sentence as did Cartwright of 3 years' probation and 500 hours of community service. Wilkinson also took the position that Avcard had sustained no actual pecuniary loss as the result of his offense conduct, reasoning that Avcard's estimated profit of $8,964.00 with respect to the locations on which FERAS/Aerocontrol bid against Avcard and won was entirely offset by Avcard's profits on untainted contracts awarded to it because of Wilkinson's offense conduct. Of specific relevance to the issues on appeal, Wilkinson took the position that DESC had suffered no actual pecuniary loss as the result of his offense conduct and, therefore, DESC was due no restitution under the MVRA. According to Wilkinson, DESC "did not sustain an actual pecuniary loss because, . . . rebidding the contracts awarded to [FERAS/Aerocontrol] did not involve additional overtime or other avoidable costs attributable solely to the offense conduct." (J.A. 131-32).

Wilkinson's sentencing hearing lasted two days, November 25-26, 2008, with the primary focus on calculating Avcard's intended and actual losses.[5] The hearing only secondarily focused on issues with regard to DESC's actual losses. While DESC's actual losses are the primary subject of the present appeal, Avcard's losses, either intended or actual, are not at issue.

---

[5]The Guidelines provide that loss is to be determined by the greater amount of intended or actual loss suffered by the victim(s) of the defendant's fraudulent acts. *See* USSG § 2B1.1, comment (n.3).

In support of its loss figures for DESC, the government offered the live testimony of Dr. Charles Untiet (Dr. Untiet), who holds a Ph.D. in economics from Stanford University.[6] He also testified that he has "quite a bit of experience in the petroleum industry." (J.A. 436). Dr. Untiet calculated DESC's actual loss from Wilkinson's offense conduct at $592,922.00, comprising three components of loss: (1) DESC's administrative costs of $26,813.00 in preparing new bid solicitation packages for the contracts tainted by Wilkinson's offense conduct and in evaluating and rewarding untainted contracts; (2) DESC's costs of $91,423.00 in procuring fuel on the open market using spot purchases between the time it cancelled the tainted contracts and the time it obtained untainted replacement contracts; and (3) $474,686.00, representing the difference in costs to DESC between the tainted contracts and the untainted replacement contracts. Dr. Untiet prepared Tables 1, 2, and 3, which were attached to the government's initial sentencing memorandum. Each table corresponded to one of the three components of DESC's loss identified by Dr. Untiet.

With respect to the administrative costs to resolicit and reaward the untainted contracts, Dr. Untiet testified that he obtained the information to create the table (*e.g.*, labor costs) "from a personnel person at the DESC." (J.A. 440). With respect to creating the table regarding spot fuel costs, Dr. Untiet testified:

> I got data on spot [fuel] sales from the DESC. I asked them for each spot [fuel] sale record. What was the date, what was the quantity. What was the spot [fuel] price the DESC paid. And what would have been the [tainted] contract price had it still been enforced.

[6]At the time of Wilkinson's sentencing hearing, Dr. Untiet was employed as an economist in the Antitrust Division of the United States Department of Justice. He described his job as trying to ascertain the competitive effects of mergers and looking at the competitive effects of regulation.

(J.A. 441). In response to an immediate follow-up question by the government, Dr. Untiet testified that the data that he obtained from DESC was on actual spot liftings at each of these locations. With respect to creating the table regarding the increased costs to DESC resulting from the difference in price for aviation fuel under the tainted contracts versus the untainted contracts, Dr. Untiet consulted published pricing indexes and the contracts themselves. Out of the eight untainted contracts, Dr. Untiet concluded that DESC paid more for aviation fuel under seven as compared to the tainted contracts. Dr. Untiet also testified that DESC resolicited and reawarded the contracts that had been tainted by Wilkinson's offense conduct, because "DESC has a policy not to deal with criminals whenever possible." (J.A. 439). At no time did the government produce, through Dr. Untiet or otherwise, any of the underlying data on which Dr. Untiet relied in order to perform his loss calculations or create Tables 1, 2, and 3.

At the sentencing hearing, Wilkinson challenged the government's proposed loss figures for DESC on three basic grounds. First, Dr. Glenn Meyers (Dr. Meyers), a Ph.D. in economics from Columbia University, testified in support of Wilkinson's position that DESC suffered no actual pecuniary loss. According to Dr. Meyers, Dr. Untiet miscalculated DESC's increased fuel costs under the untainted contracts by assuming, unrealistically, that Avcard would have performed under the contracts, but at FERAS/Aerocontrol's prices. Second, Wilkinson argued the government had provided no documentary evidence to support its $592,922.00 total loss figure. For example, with respect to the government's loss figure regarding DESC's fuel purchases on the spot market, Wilkinson pointed out that the government had not offered any proof, such as invoices, that DESC had actually purchased aviation fuel on the spot market for airport locations that were the subject of the tainted contracts. For a second example, Wilkinson contended that DESC suffered no actual pecuniary loss in resoliciting bids for the tainted contracts, because DESC's employees are salaried, and there is no evidence that

such employees performed overtime in order to carry out the resolicitations.

In rebuttal, the government contended that its expert witness "testified that he reviewed all the underlying data from DESC, including the actual liftings, including the hourly wage reports, and these various things to make his calculations, and that he presented a series of graphs that represented his conclusions as to loss. That's evidence." (J.A. 650). *See also* (J.A. 651) (government: "DESC has the data, it provided it to Dr. Untiet, he testified to the Court. Same thing as to the administrative calculations."). Additionally, the government argued that Application Note 3(A)(v)(II) to USSG § 2B1.1 expressly permitted it to count as loss the monetary compensation that DESC paid its employees for their time in resoliciting bids for the tainted contracts regardless of whether those employees performed such work during overtime hours. *See* USSG § 2B1.1, comment. (n.3(A)(v)(II)) ("*Procurement Fraud Cases*.—In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected . . . .").

After considering the parties' opposing positions on the actual pecuniary loss suffered by DESC as the result of Wilkinson's offense conduct, the district court stated, in relevant part:

> Having heard the testimony from expert witnesses yesterday on both sides, and argument this morning, all of that has helped me to reach a conclusion with regard to an appropriate guideline loss calculation. **I have to say that I found both of the expert witnesses to be knowledgeable, both to be credible, which is unusual when you have such diverging opinions about things. But I believe that each one**

**of them presented their calculations and their opinions straight forwardly and as honestly as any fact finder could hope for.** What I come away convinced of is that with respect to the economic issues that are involved in considering loss valuations in this particular matter, the complexities and the variables are uniquely difficult to analyze and evaluate in a meaningful way.

To support its proposed loss figures, of course, the Government must satisfy me that those figures are proven by a preponderance of the evidence. That in my view, having heard all that I have heard, is a burden that the Government simply cannot meet on the basis of the facts presented in this record. . . .

* * *

The Government's claim of additional losses to DESC, of course, is discussed at considerable length in the sentencing memoranda, spoken to at considerable length here yesterday and today. The Government relies on figures that are set out in tables 1 though 3 of Appendix A to its initial memorandum. **My assessment of these claimed losses is that they are simply not sufficiently supported by facts to persuade me that they constitute losses that more likely than not were caused by this defendant's conduct. Even assuming that loss was caused to the Government, my conclusion is that I would have to engage in speculation to assess any dollar value to it.**

(J.A. 657-59) (emphasis added). The district court then went on to state: "So for the guideline calculation, by way of a reasonable estimate, the best I can do with it is to accept the defendant's recalculated figure of intended loss to AVCARD $39,741." (J.A. 659). Such figure increased Wilkinson's base

offense level under the Guidelines by six levels, and with the other sentencing adjustments applied by the district court (two levels added because a substantial part of the fraudulent scheme was committed from outside the United States, USSG § 2B1.1(b)(9)(B), and two levels subtracted for acceptance of responsibility, *id.* § 3E1.1(a)),[7] the district court determined Wilkinson's advisory Guidelines sentencing range to be 12 to 18 months' imprisonment.

After hearing more argument from counsel for both sides, statements from Wilkinson's wife, mother, and Wilkinson himself, the district court stated that, in its perspective, the Guidelines calculation regarding loss was

> so tenuous as to be anything but reliable in terms of fashioning a sentence that comports with the sentencing factors set out in Title 18, section 3553. And so the sentence that I am imposing is going to be a variance sentence. And it's based upon my conclusions and observations with regard to the following 3553 factors.

(J.A. 727). The district court then went on to address the § 3553 factors in a manner favorable to Wilkinson, stating at one point that it was "convinced that what took place here with respect to the criminal conduct would most likely not have happened but for the aggressive intervention of Mr. Bittenbender." (J.A. 731). The district court ultimately sentenced Wilkinson to a three-year term of probation as to Counts I, II, and III, to run concurrently, and to 800 hours of community service. Additionally, the district court ordered Wilkinson to pay a $20,000.00 fine, a $300.00 special assessment, and $40,962.75 in restitution to Avcard under the MVRA.

---

[7]The district court did not subtract an additional level under USSG § 3E1.1(b) for acceptance of responsibility, because the offense level determined prior to subtracting two levels for acceptance of responsibility under USSG § 3E1.1(a) was not a level 16 or greater. *See id.* § 3E1.1(b).

## II.

The government's challenge to Wilkinson's sentence focuses on the district court's finding that DESC suffered no actual pecuniary loss as the result of Wilkinson's offense conduct for purposes of applying USSG § 2B1.1(b)(1), and the government's challenge to the district court's refusal to award DESC restitution focuses on the same finding for purposes of applying the MVRA. Under the Sentencing Guidelines, "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," USSG § 2B1.1, comment. (n.3(A)(i)), and "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense," *id.* (n.3(A)(iv)). Moreover, of particular relevance in the present appeal, Application Note 3(A)(v)(II) to USSG § 2B1.1 specifies:

> In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable.

*id.* § 2B1.1, comment. (n.3(A)(v)(II)).

Additionally, the amount of any restitution due DESC under the MVRA is the amount of actual loss to DESC directly and proximately caused by Wilkinson's offense conduct. 18 U.S.C. § 3663A(a)(2). Indeed, the MVRA defines the term "victim" as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense

that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

*Id.* § 3663(a)(2). Under the MVRA, the government bears the burden of proving a victim's loss by a preponderance of the evidence. *Id.* § 3664(e); *United States v. Harvey*, 532 F.3d 326, 339 (4th Cir. 2008).

On appeal, the government challenges Wilkinson's sentence on the basis that the district court's finding that DESC suffered no actual pecuniary loss as the result of Wilkinson's offense conduct is clearly erroneous. With respect to calculating DESC's actual pecuniary loss under USSG § 2B1.1(b)(1), the government argues that had the district court properly applied Application Note 3(A)(v)(II) to USSG § 2B1.1, the district court necessarily would have found that DESC had suffered $592,922.00 in such loss as the result of Wilkinson's offense conduct.[8] Such a finding, according to the government, would have resulted in an adjusted offense level under the Guidelines of 20 and an advisory Guidelines sentencing range of 33 to 41 months' imprisonment. Because the district court improperly calculated Wilkinson's advisory Guidelines sentencing range, as the government's argument goes, we cannot uphold the district court's sentence as procedurally reasonable nor reach the issue of its substantive reasonableness. Therefore, the government posits, we should vacate Wilkinson's sentence and remand for resentencing with the instruction that the district court calculate DESC's actual pecuniary loss pursuant to proper application of Application Note 3(A)(v)(II) to USSG § 2B1.1. *See United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009) (improperly calculating advisory Guidelines sentencing range constitutes procedural error in sentencing which requires remand for

---

[8]The government contends that the district court either did not apply Application Note 3(A)(v)(II) at all or incorrectly applied it *sub silentio*.

resentencing without addressing whether sentence is substantively reasonable under abuse of discretion standard). With respect to the restitution issue, the government posits that if we "hold[] that the district court clearly erred in finding no [actual pecuniary loss to DESC], DESC will be entitled to restitution to the full extent of its losses determined on remand." (government's Reply Br. at 7-8).

On a macro level, Wilkinson defends the judgment below on the ground that the district court's finding that DESC suffered no actual pecuniary loss as the result of his offense conduct is not clearly erroneous. On a micro level, Wilkinson argues that the government failed to carry its burden of proof on DESC's actual pecuniary loss, because "the government's case for actual loss to DESC rested on three conclusory charts the government's expert created with numbers he had received from an interested party, had not corroborated, and on which he could not be cross-examined." (Wilkinson's Br. at 26).

Our review of Wilkinson's sentence must take place in two sequential steps. *Carter*, 564 F.3d at 328. In the first step, we must ensure that the district court did not commit a significant procedural error in sentencing Wilkinson. *Id.* If it did, we must vacate and remand for resentencing. *Id.* at 329-30. Only if we conclude that the district court committed no significant procedural error in sentencing Wilkinson, may we move on to the second step of considering the substantive reasonableness of his sentence under an abuse of discretion standard. *Id.* at 328.

The government is correct that Wilkinson would need to be resentenced if we were to conclude that the district court's finding that DESC suffered no actual pecuniary loss as the result of Wilkinson's offense conduct is clearly erroneous. This is because proper calculation of the advisory Guidelines sentencing range is dependent upon a non-clearly erroneous finding of such loss, USSG § 2B1.1(b)(1), and improper cal-

culation of such range as well as selecting a sentence based on a clearly erroneous factual finding are procedural errors that require correction before we can review Wilkinson's sentence for substantive reasonableness, *Carter*, 564 F.3d at 328. *See also id.* at 330 n.4 ("Having found the sentence procedurally unreasonable, however, we cannot review the sentence for substantive reasonableness.").

In reviewing a district court's finding of fact made at sentencing, we are mindful that the traditional rules of evidence are not applicable to sentencing proceedings. *See* Fed. R. Evid. 1101(d)(3). Rather, a sentencing court may give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy. *United States v. Bowman*, 926 F.2d 380, 381 (4th Cir. 1991); USSG 6A1.3(a), p.s. "[W]here the reliability of evidence is an issue the court should conduct an evidentiary hearing to determine the same." *Bowman*, 926 F.2d at 381; *see also* USSG 6A1.3(b), p.s.

Unfortunately, the district court did not provide us anything close to a sufficient explanation of its rationale in making its loss finding with respect to DESC that would enable us to review such finding under the clearly erroneous standard. For example, the district court gave no explanation for its seemingly inconsistent position in finding the government's expert witness regarding DESC's actual pecuniary loss knowledgeable and credible, but nonetheless rejecting his loss calculations *in toto* without explanation, making it totally incapable of meaningful appellate review. For a second example, we agree with the government that Wilkinson's argument to the effect that in order for DESC to have suffered an actual pecuniary loss in the form of administrative costs, the government had to prove that DESC employees worked overtime in resoliciting bids and reawarding nontainted contracts is at odds with the plain language of Application Note 3(A)(v)(II) to USSG § 2B1.1. However, we have no idea whether the district court accepted this argument or accepted Wilkinson's

alternative argument that, assuming *arguendo* that DESC's administrative costs as calculated by the government are theoretically recoverable, the government nonetheless failed to carry its burden of proof because it offered no documentary evidence to support such costs (*e.g.*, wage and hour records).

In order to address the government's sentencing challenge, we would have to know which argument (if any) the district court accepted, and under *Carter*, we are prohibited from presuming the sentencing court has "silently adopted arguments presented by a party." 564 F.3d at 329. The same situation holds true for the government's spot pricing evidence as well as its evidence regarding increased costs for aviation fuel under the tainted contracts verses the untainted contracts. In short, on the present record, we cannot hold Wilkinson's sentence procedurally reasonable. *Id.* at 328-30. Additionally, the record is not amenable to appellate review with respect to the government's challenge to the district court's finding that DESC suffered no actual pecuniary loss for purposes of calculating restitution under the MVRA.

Accordingly, we vacate the sentencing portion of Wilkinson's judgment and remand the case for resentencing with instructions that the district court explain in detail why it believes DESC's claimed actual losses, as set forth in Tables 1, 2, and 3 of Appendix A to the government's initial sentencing memorandum, are not sufficiently supported by the expert testimony of Dr. Untiet, for purposes of calculating Wilkinson's advisory Guidelines sentencing range and awarding DESC restitution under the MVRA. For example, did the district court accept Wilkinson's argument that without any documentary evidence such as invoices, the government failed to carry its burden of proving that it had made spot purchases of aviation fuel for the airport locations that were the subject of the tainted contracts during the interim time between DESC's cancelling of such contracts and their respective untainted reaward? Moreover, as part of its explanation, we specifically instruct the district court to explain the seeming inconsistency

between its zero-loss finding as to DESC and its declaration that it found Dr. Untiet knowledgeable and credible. Notably, if the district court reached its zero-loss finding under USSG § 2B1.1(b)(1) based upon its acceptance of Wilkinson's lack of over-time argument, the district court must revisit its calculation of DESC's actual pecuniary loss under USSG § 2B1.1(b)(1), because such argument, as we have already stated, is at odds with the plain language of Application Note 3(A)(v)(II) to USSG § 2B1.1.[9]

Having arrived once again at the advisory Guidelines sentencing range stage,[10] the district court must next allow the government and Wilkinson "an opportunity to argue for whatever sentence" each "deem[s] appropriate." *Gall v. United States*, 552 U.S. 38, 49 (2007). Following such arguments, the district court should then proceed to render Wilkinson's sentence. In reaching such sentence, "[r]egardless of whether the district court imposes an above, below, or within-Guidelines sentence, it must place on the record an 'individualized assessment' based on the particular facts of the case before it."[11]

---

[9]We recognize that in making its loss finding with respect to DESC under the MVRA, the district court is not bound by Application Note 3(A)(v)(II) to USSG § 2B1.1, and thus, the district court may reach a different loss finding for DESC under USSG § 2B1.1(b)(1) rather than under the MVRA. *See United States v. Allen*, 529 F.3d 390, 397 (7th Cir. 2008) (Application Notes to USSG § 2B1.1 not controlling in calculating loss under the MVRA).

[10]If the district court changes its loss finding under USSG § 2B1.1(b)(1) with respect to DESC, depending upon the amount of loss found, such finding has the potential to change the advisory Guidelines sentencing range. However, we make clear that the district court may not revisit on remand either the issue of Wilkinson's intended pecuniary loss to Avcard nor Avcard's actual pecuniary loss, because the government does not challenge those loss findings on appeal. Thus, if the district court continues to find that DESC suffered no actual pecuniary loss as the result of Wilkinson's offense conduct, Wilkinson's advisory Guidelines sentencing range will remain at 12 to 18 months' imprisonment.

[11]In making this individualized assessment, the sentencing court must apply the relevant factors of 18 U.S.C. § 3553 to the specific circumstances of Wilkinson's case. *Carter*, 564 F.3d at 328.

*Carter*, 564 F.3d at 330 (quoting *Gall*, 552 U.S. at 50). Such making of the record is critical, because "[i]n reviewing this assessment, an appellate court may not guess at the district court's rationale, searching the record for statements by the Government or defense counsel or for any other clues that might explain a sentence." *Carter*, 564 F.3d at 329-330.

Finally, we instruct the district court to reconsider with care its determination that DESC was not entitled to any restitution under the MVRA. If, after such reconsideration, the district court continues to adhere to its zero-loss finding with respect to the government's claim of restitution due DESC under the MVRA, we instruct the district court to provide a detailed rationale for such finding on the record in order that we may review it under the clearly erroneous standard. If, however, after such reconsideration, the district court finds that DESC is entitled to a particular amount of restitution under the MVRA, we instruct the district court to order restitution to DESC in such amount and to provide a detailed rationale for such loss finding on the record in order that we may review it under the clearly erroneous standard.

### III.

In conclusion, we vacate Wilkinson's sentence and remand with instructions for: (1) resentencing; and (2) reconsideration of the district court's determination that DESC was entitled to no restitution under the MVRA, accompanied by an order of restitution if the district court finds that DESC is entitled to a particular amount of restitution under the MVRA.

*VACATED AND REMANDED*

MOON, District Judge, concurring in part and dissenting in part:

I concur with the majority regarding the administrative cost finding. Because the district court may have erred as a matter

of law, I agree that we should remand as to that element of loss. However, I find no clear error in the loss findings with regard to either the higher spot fuel purchases or the higher contract prices. Accordingly, I would affirm the district court as to those findings.

The majority holds that the district court failed to sufficiently explain its zero-loss finding. However, the sentencing judge concluded that the government had not met its burden of proof to establish loss. (J.A. 658). The sentencing judge observed that, although he found both the government expert and defense expert to be "credible," he nevertheless found the defense expert more "compelling," stating that:

> I find one of [the defendant's expert's] primary opinions to be particularly compelling. And that was a statement that he made to the effect that the defendant's calculations **are probably about as accurate as one could hope for in situations like this."**

(J.A. 658) (emphasis added). Moreover, the sentencing judge stated that his "assessment of [the government's] claimed losses is that they are simply not sufficiently supported by the facts to persuade me that they constitute losses that more likely than not were caused by this defendant's conduct." (J.A. 659).

The record discloses that the district court sufficiently justified its factual finding of zero loss to DESC as to the higher spot fuel prices and higher contract prices. That the sentencing court did not describe in greater detail the rationale underlying its factual finding is not sufficient grounds for remand, and is outside the scope of the particularity requirements announced in *Carter*. In my view, *Carter* requires a sentencing court to state with particularity the reasons supporting a chosen sentence.* It does not address, however, the degree of

---

*See *Carter* at 328 ("When **rendering a sentence**, the district court 'must make an **individualized** assessment based on the facts presented.'"

specificity required when making a finding of fact upon which a sentence is to be predicated.

---

(quoting *Gall v. United States* at 39) (first emphasis added)); *see also id.* (when stating its reason for imposing a sentence, a sentencing court need only "'set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority.'" (quoting *Rita v. United States*, 551 U.S. 338, 339 (2007))).