PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee,*

v.

CHRISTIAN M. ALLMENDINGER,

　　　　　*Defendant-Appellant.*

No. 11-5162

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, Senior District Judge.
(3:10-cr-00248-REP-1)

Argued: December 7, 2012

Decided: January 23, 2013

Before TRAXLER, Chief Judge, and GREGORY and
DAVIS, Circuit Judges.

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Gregory and Judge Davis joined.

## COUNSEL

**ARGUED:** Barry Joel Pollack, MILLER & CHEVALIER,
CHARTERED, Washington, D.C., for Appellant. Michael
Steven Dry, OFFICE OF THE UNITED STATES ATTOR-
NEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Laura

G. Ferguson, Mia P. Haessly, MILLER & CHEVALIER, CHARTERED, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, Jessica Aber Brumberg, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia; Denis J. McInerney, Chief, Albert B. Stieglitz, Jr., Trial Attorney, Criminal Division, Fraud Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

TRAXLER, Chief Judge:

Christian M. Allmendinger appeals his conviction and sentence for several crimes relating to an investment scheme that resulted in nearly $100 million dollars in losses for investors. Finding no error, we affirm.

## I.

Allmendinger and Brent Oncale founded a company known as "A&O" in Houston, Texas, in late 2004. The company sold life settlement investments, which are interests in life insurance policies. Until the end of 2006, A&O sold "bonded life settlements," which were interests in particular life insurance policies. The investments were for fixed terms of between four and seven years. If the insured died during the term, the life insurance company would pay a benefit, but if the insured remained alive, a reinsurance bond, which A&O purchased from Provident Capital Indemnity ("PCI"), was designed to pay out and take over the life insurance policy (so long as the life insurance policy premiums were current).

Allmendinger and Oncale marketed and sold A&O's bonded life settlements directly to investors. In 2005, they

hired Adley Abdulwahab to help market the products through his company, Houston Investment Center ("HIC"). In marketing A&O's products, both orally and through written materials they created, Allmendinger, Oncale, and Abdulwahab lied about many critical facts. For example, they represented that investor funds were placed in a segregated account dedicated to those payments and used right away to pay policy premiums up front; in reality, although A&O paid the premiums, it had no separate account for that purpose and it paid them only as they became due. Indeed, money invested with A&O was commingled in a general operating account from which A&O paid its bills. Over the time that A&O was in business, Allmendinger, Oncale, and Abdulwahab took advantage of this structure, misappropriating millions of dollars from this account for themselves.

The three men also misrepresented A&O's size, staff, and record of earning returns for its investors. In 2005 and 2006, A&O's websites, whose content Allmendinger and Oncale had created, listed fictional people as company principals, falsely stated that A&O had offices in multiple states, greatly exaggerated the number of A&O employees, and falsely stated that A&O had particular legal and business professionals on its staff. The sites also stated that A&O had "enabled [their] clients to leverage $375 million into $800 million in less than five years," J.A. 512 (internal quotation marks omitted), when in actuality, no investor had received any pay out at that time.

In 2006, Allmendinger and Oncale invited Abdulwahab, who was excelling at selling for A&O, to become a partner. Thereafter, the three men each held an equal interest in A&O and shared authority over the company.

By late 2006, regulators from different states began to send inquiries to A&O regarding its life settlement product, largely based on concerns that A&O was selling an unregistered security. These inquiries prompted the three partners to con-

sult with Florida attorney Michael Lapat, who assisted A&O in setting up hedge funds that were backed by life settlements. By early 2007, A&O began offering fractionalized interests in these funds that they called "capital appreciation bonds."

This format change did not stem the tide of regulator inquiries, however, and Allmendinger, Abdulwahab and Oncale agreed to sell A&O to a company called "Blue Dymond." Before the sale, however, Allmendinger, Abdulwahab, and Oncale helped themselves — for what Allmendinger believed was one final time — to several hundred thousand dollars from A&O's operating fund. After this raid on A&O's coffers, only $2.9 million remained in A&O's bank accounts — not even half of the amount A&O needed to pay the premiums on all of its policies up through their bonding dates.

Unbeknownst to Allmendinger, however, Abdulwahab and Oncale had constructed an elaborate secret plan to purchase the company themselves and continue running it. Blue Dymond — the buyer of A&O — was little more than a front for Abdulwahab and Oncale; it was a shell company created and funded by Abdulwahab and Oncale with the assistance of attorney Russell Mackert and without the knowledge of Allmendinger.

Under the terms of the sale, the partners were to receive $750,000, with the expectation of an additional $250,000 in the 18 months following the sale. While Allmendinger received his $750,000, Oncale and Abdulwahab — unbeknownst to Allmendinger — received only $750 and secretly continued the business through Blue Dymond. Through August 31, 2007, the date of the sale, Allmendinger had personally received $8,455,033.60 from A&O; Oncale had received $7,303,496.98; and Abdulwahab had received $2,889,366.70. Allmendinger used his money to live an exceptionally extravagant lifestyle, purchasing expensive jewelry, cars, and other items, including a $2 million home.

In September 2007, Abdulwahab and Oncale hired David White to serve as A&O's president. During this time, A&O continued generally to operate in much the same manner as it had before Allmendinger sold his interest. Indeed, A&O continued to employ the fraudulent marketing materials Allmendinger and his co-conspirators had created. The remaining principals, however, accelerated their misappropriation of investor funds. In the fall of 2007, A&O funds amounting to $11 million were deposited in Mackert's account and distributed to Abdulwahab and Oncale. A&O ceased making premium payments on many of its life insurance policies, causing them to lapse, and A&O stopped taking new investor funds in early 2008. Thereafter, Mackert took over the management of A&O and subsequently placed A&O into bankruptcy. From November 2004 until 2008, A&O's more than 800 investors lost more than $100 million.

In January 2010, Allmendinger was interviewed by federal prosecutors and law enforcement agents and informed that he would be indicted based on his involvement with A&O. In the following weeks, Allmendinger began to hide his assets. His father opened a bank account in February 2010, and more than $676,000 in funds that Allmendinger had previously held with his father in a joint account was deposited into the new account. His father then used some of those funds to pay more than $300,000 of Allmendinger's credit card debt.

On September 7, 2010, Allmendinger, Abdulwahab, and White, were indicted in the Eastern District of Virginia.[1] On February 1, 2011, the grand jury returned a superseding indictment against the three men. Allmendinger was charged

---

[1]As a result of cooperating with the government, Oncale was able to plead guilty pursuant to a plea agreement to one count of conspiracy to commit mail fraud and one count of conspiracy to commit money laundering. He received a sentence of 10 years' imprisonment. Mackert pled guilty to a criminal information alleging mail fraud conspiracy and bulk cash smuggling, *see* 31 U.S.C. § 5332, and received a sentence of 188 months' imprisonment.

with one count of mail fraud conspiracy, *see* 18 U.S.C. § 1349 (Count 1); three counts of mail fraud, *see* 18 U.S.C. § 1341 (Counts 2-4); one count of money laundering conspiracy, *see* 18 U.S.C. § 1956(h) (Count 8); three counts of money laundering, *see* 18 U.S.C. § 1956(a)(1)(A)(i) (Counts 9-11); and two counts of securities fraud, *see* 15 U.S.C. §§ 77q(a), 77x (Counts 15 and 16). The superseding indictment charged that the purpose of the alleged conspiracy was "to mislead investors regarding A&O's safekeeping and use of investor funds and the risks of A&O's investment offerings, in order to obtain investor funds so that the conspirators could personally profit." J.A. 269.1. The indictment charged that the sham sale was part of the conspiracy and that the conspiracy continued as Abdulwahab, Oncale, and White continued the business without Allmendinger.

After the grand jury returned the initial indictment on September 7, 2010, a restraining order was entered the next day against all of Allmendinger's then-known accounts. Allmendinger responded by surreptitiously opening three new bank accounts and using them to receive and hold $125,000 in checks from his father. He did not inform either the government or the district court of the existence of these accounts.

Allmendinger filed a motion to sever his trial from Abdulwahab's, contending that their defenses would be antagonistic and Allmendinger would be prejudiced if they were tried together.[2] Allmendinger also moved to strike the allegations in the indictment concerning events that occurred after the August 31, 2007, sale of his share of A&O. And he moved to dismiss the two conspiracy counts, arguing that each count in actuality alleged two conspiracies, the second of which began after August 31, 2007. The district court rejected the argument that the counts each alleged two separate conspira-

---

[2]White pled guilty to a criminal information alleging conspiracy to commit mail fraud, money laundering, and securities fraud, and he was sentenced to five years' imprisonment.

cies, stating that "[t]he language in the [superseding indict-ment] permits the government to prove facts supporting the existence of a single, overarching conspiracy, the purpose of which was to defraud investors, from November 2004 to Jan-uary 2008." J.A. 357. The district court therefore denied All-mendinger's motion to dismiss and his motion to strike, but the court granted Allmendinger's motion to sever.[3]

Allmendinger's jury trial then began. At the close of the government's case, Allmendinger moved for a judgment of acquittal on all counts. During the hearing on that motion, the district court observed that no evidence of Allmendinger's involvement in the A&O scheme after August 31, 2007, had been presented. In light of that fact, notwithstanding that the court had denied Allmendinger's pre-trial motion to strike, the government suggested striking the indictment language con-cerning post-sale events and the sham nature of the sale of A&O. In a reversal from his pretrial position, Allmendinger's counsel objected to the proposed redaction, arguing that the government's request amounted to a concession that the con-spiracy counts each alleged two separate conspiracies, only one of which the government had supported with evidence. The district court overruled Allmendinger's objection, noting that it was only because of the severance of Allmendinger's trial that the government did not present evidence of the con-tinuation of the conspiracy after Allmendinger ended his involvement. The court reasoned that striking the post-sale allegations was appropriate to protect Allmendinger from the prejudice that might result were the jury to consider them. The district court granted Allmendinger's Rule 29 motion as to one mail fraud and one securities fraud count but otherwise denied the motion. Allmendinger renewed his Rule 29 motion

---

[3]In June 2011, Abdulwahab was tried separately by a jury, which found him guilty of mail-fraud conspiracy and money-laundering conspiracy, five counts each of mail fraud and money laundering, and three counts of securities fraud. Abdulwahab was sentenced to 60 years' imprisonment. His appeal is currently pending before a panel of this court.

after the close of his case as to the remaining counts, but the court again denied it.

As per the court's ruling, the government redacted the superseding indictment to remove allegations of events that occurred after August 31, 2007, and the events relating to the sham nature of the sale. Most of the changes simply involved deleting language; however, a few involved rewriting allegations. In the rewritten passages, the government changed the amount of funds lost by A&O investors from "approximately $100 million" to "approximately $79.9 million," changed the number of A&O investors from "more than 800" to "more than 580," and changed the dates of the alleged conspiracies from "November of 2004 through the present" to "November of 2004 through August 31, 2007." *Compare* J.A. 267.1-268.1, 278.1 *with* J.A. 238-39, 249. The court provided the jury with the revised indictment. The jury subsequently found Allmendinger guilty of all seven remaining counts.

At sentencing, the district court proceeded to determine Allmendinger's advisory Guideline range. The court concluded that the Guidelines called for grouping of the mail and securities fraud and conspiracy to commit mail fraud offenses (Counts 1, 2, 3, and 15) and the money laundering offenses (Counts 8, 9, and 11). *See* U.S.S.G. § 3D1.2 (2010). The parties argued various issues regarding the first group, most importantly the amount of loss that Allmendinger's crimes caused.

Allmendinger objected to the recommendation in the presentence report of a loss amount greater than $50 million but not more than $100 million. The reinsurance bonds that A&O had bought from PCI, which were intended to take over the life insurance policies and make the payouts to the investors, turned out to be fraudulent, and PCI therefore did not pay out even when the bonds' terms required payment. Allmendinger argued that the fraudulent bonds caused the bulk (approximately $67 million) of the investors' losses. Allmendinger

maintained that PCI's fraud was not foreseeable and that he should not be held responsible for the losses attributable to the bond fraud.

The court overruled Allmendinger's objections and determined the loss amount to be $93,920,635.46, which reflected the total amount lost by the 825 investors during the entire scheme less the amount that had been recovered in the related A&O bankruptcy as of the date of the sentencing. The court reasoned that Allmendinger had set up a scheme based on wide-ranging lies intended to induce people to invest their money in accounts that Allmendinger could use "as his personal piggy bank." J.A. 2302. As the court noted, Allmendinger lied about "the structure and size and soundness of the company, the extent of its reach, and the kind of activities in which it engaged, the kind of success it had had, the yields that it had had," and lied when he claimed that investors' money would be placed in escrow or would be used to prepay the policy premiums. J.A. 2302. The court found that even as Allmendinger sold his share, "he knew that Abdulwahab at least was going to continue in the business even though he didn't know Abdulwahab was going to end up being one of the owners." J.A. 2302-03. The court concluded that "when you are operating a business that is based on fraud, you are charged with the knowledge that you potentially put at risk everybody's money that you've got and you've stolen and inveigled them to part with." J.A. 2304. The court further found that it was reasonably foreseeable to Allmendinger that those continuing the business "were going to engage in exactly the same kind of conduct." J.A. 2304.

Because the court determined that the loss from the conspiracy exceeded $50 million, the court applied a 24-level increase to Allmendinger's base level under the Sentencing Guidelines pursuant to U.S.S.G. § 2B1.1(b)(l)(M). This enhancement and others produced an adjusted offense level of 45 for the first group, and a combined adjusted offense level of 45, which was treated as a total offense level of 43, *see*

U.S.S.G. Chap. 5, Pt. A n.2 (providing that a total "offense level of more than 43 is to be treated as an offense level of 43"). This offense level and Allmendinger's criminal history category of I yielded an advisory Guidelines range of life imprisonment, capped by a statutory maximum of 1,500 months' imprisonment. *See* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

Allmendinger sought a downward departure on two bases. First, he contended that the loss amount found by the district court overstated the seriousness of his conduct. Allmendinger argued that the loss amount greatly exceeded the foreseeable losses given that the life insurance policy premiums were paid during the time he was operating the company and that he had no reason to know that PCI's bonds were worthless. He also sought a downward departure based on his contention that he received a large number of enhancements, some of which overlapped with each other.

While arguing for a below-guidelines sentence, defense counsel emphasized that Allmendinger was a first-time nonviolent offender and compared Allmendinger's conduct to that of Oncale, who had pled guilty pursuant to a plea agreement to one count each of mail fraud and money laundering and had received a sentence of only 10 years. Counsel maintained that Allmendinger and Oncale were similarly situated and should receive similar sentences, and counsel reiterated his argument that the loss found by the court was much larger than Allmendinger could reasonably have foreseen.

In response, the government argued that Allmendinger and Oncale actually were not similarly situated, contrasting Oncale's prompt cooperation after he was approached by investigators with Allmendinger's continued evasion and attempts to hide and spend his money, and his possible inten-

tion to flee. The government stressed that Allmendinger's crimes had far-reaching impact, had "destroyed countless lives," and thus warranted a very severe sentence in order to deter those who would consider committing similar crimes. J.A. 2403. The government also noted that Mackert, who was not an architect of the fraud and who ended up with only $250,000 from his participation in the scheme, was sentenced to almost 16 years.

In the end, the district court concluded that no downward departure was warranted under the Guidelines. However, the court, in discussing at length the 18 U.S.C. § 3553(a) factors, noted the need for Allmendinger's sentence to promote respect for the law by being sufficiently, but not excessively, severe and by not penalizing Allmendinger for exercising his right to go to trial. In this regard, the court concluded that a 1500-month sentence would be "harsher than is necessary in order to achieve the objectives of the sentencing." J.A. 2416. In determining what sentence would be appropriate, the court noted that it was taking into consideration "the fact that there were many enhancements applied" and that the loss the court found might not adequately reflect that Allmendinger did not set out to steal *all* of the money entrusted to him, given that he "did bond some of the obligations and did have premiums paid." J.A. 2416. However, the court also specifically noted that as Allmendinger began to suspect that his scheme would be discovered, he continued to attempt to avoid responsibility, to hide and spend the money he had taken, and to make plans to flee, thus demonstrating the need for a sentence that would provide specific deterrence. The court also added that "general deterrence is particularly necessary in a crime of this sort." J.A. 2418. And the court cited the need to avoid unwarranted disparities among similarly situated defendants. In the end, the court sentenced Allmendinger to 540 months' imprisonment and ordered him to pay restitution in the amount of $101,963,048.05.

## II.

Allmendinger first argues that the district court erred in altering the superseding indictment. Specifically, he contends that the district court violated his Fifth Amendment rights by altering the indictment to omit the allegations relating to the time after Allmendinger sold his interest in A&O and to rewrite other language to reflect the shorter duration of the conspiracy alleged in the altered indictment. On that basis, he argues for reversal on the two conspiracy counts as well as the associated substantive counts. We disagree.

The Fifth Amendment to the United States Constitution provides, as is relevant here, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. Const. Amend. V. "When the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment—sometimes referred to as a fatal variance—occurs." *United States v. Malloy*, 568 F.3d 166, 178 (4th Cir. 2009). An indictment is constructively amended, and a fatal variance occurs, when "the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (internal quotation marks omitted). However, not every difference between the government's proof and the indictment constitutes a fatal variance. *See United States v. Redd*, 161 F.3d 793, 795 (4th Cir. 1998). When the government's proof diverges to some degree from the indictment but does not change the crime charged in the indictment, a mere variance occurs. *See id.* Such a variance violates the defendant's Fifth Amendment rights only if it "prejudices [him] either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense." *United*

*States v. Ashley*, 606 F.3d 135, 141 (4th Cir. 2010) (internal quotation marks omitted).

When a court is considering a constructive amendment claim, "it is the *broadening* [of the bases for the defendant's conviction] that is important — nothing more." *United States v. Floresca*, 38 F.3d 706, 711 (4th Cir. 1994) (en banc) (emphasis added). "The key inquiry is whether the defendant has been tried on charges other than those made in the indictment against him." *United States v. Roe*, 606 F.3d 180, 190 (4th Cir. 2010). Regarding conspiracies, "a prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged, so long as that subset is also illegal." *United States v. Wilson*, 134 F.3d 855, 865 (7th Cir. 1998) (citation and internal quotation marks omitted). Additionally, "an indictment can be amended without further consideration by the grand jury when it is necessary to strike surplusage, or to correct the indictment's form, e.g., a misnomer, or a typographical error." *United States v. Whitfield*, 695 F.3d 288, 308 (4th Cir. 2012) (citations omitted). Whether an indictment has been constructively amended is a question we review de novo. *See id.* at 306.

In this case, the government, by limiting its case to events occurring while Allmendinger was an owner of A&O, simply proved a more narrow conspiracy than was charged in the superseding indictment. By limiting its case to events occurring while Allmendinger was an owner of A&O, the government proved a conspiracy that was shorter in duration (and therefore caused fewer losses to investors) than the charged conspiracy. The conspiracy proven by the government nonetheless shared the same purpose as the charged conspiracy and was premised on the same fraudulent representations alleged in the indictment. Because the conspiracy proven was within the scope of those alleged in the unredacted indictment, the narrowing at most created a non-fatal variance. Allmendinger makes no claim that the amendment surprised him

or hindered his defense. And, there is no danger of further prosecution, as the omitted allegations in the indictment concerned not Allmendinger's conduct, but that of those who continued running the fraudulent business after Allmendinger discontinued his participation.

Allmendinger notes that the district court not only allowed the government to prove the narrower conspiracy, but also revised the indictment by striking some paragraphs and rewriting others to reflect the reduced scope of the conspiracy, and then compounded the error by sending the indictment back with the jury. In this regard, Allmendinger cites *Ex parte Bain*, 121 U.S. 1 (1887), for the proposition that it does not lie "within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been." *Id.* at 10. However, to the extent that *Bain* held that the narrowing of an indictment violated the defendant's Fifth Amendment rights, *Bain* was overruled in *United States v. Miller*, in which the Court noted that it had "sustain[ed] convictions where courts had withdrawn or ignored independent and unnecessary allegations in the indictments." 471 U.S. 130, 144 (1985); *see Floresca*, 38 F.3d at 710 n.10. And while it is true that some of the narrowing here was accomplished not just by deleting words but also by changing words, Allmendinger offers no reason why this distinction would have constitutional significance. Since the charges were narrowed rather than broadened, Allmendinger's constitutional rights were not abridged.

III.

Allmendinger next challenges his sentence.

Since the Supreme Court issued its decision in *United States v. Booker*, the Sentencing Guidelines are no longer mandatory but rather are "effectively advisory." 543 U.S. 220, 245 (2005). When sentencing criminal defendants after *Booker*, district courts must begin by correctly calculating the

defendant's sentencing range under the Sentencing Guidelines. *See Gall v. United States*, 552 U.S. 38, 49 (2007). The court is next required to give the parties the opportunity to argue for what they believe to be an appropriate sentence, and the court must consider those arguments in light of the factors set forth in 18 U.S.C.A. § 3553(a). *See id.* at 49-50; *United States v. Abu Ali*, 528 F.3d 210, 260 (4th Cir. 2008).

Our review of Allmendinger's sentence can be divided into two steps. First, we must consider whether the district court committed a significant procedural error, such as improperly calculating the appropriate guideline range or inadequately explaining the sentence imposed. *See United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010); *United States v. Lynn*, 592 F.3d 572, 575 (4th Cir. 2010). If it did, then we must vacate the sentence and remand for resentencing. *See Wilkinson*, 590 F.3d at 269. If it did not, then we consider whether the sentence imposed was substantively reasonable under an abuse-of-discretion standard. *See id.*

A.

1.

Allmendinger first seeks vacatur of his sentence and the restitution order, arguing that his sentence was procedurally unreasonable because the district court erred in calculating the amount of loss under U.S.S.G. § 2B1.1(b)(1). We disagree.

The Guidelines instruct that the amount of loss is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n. 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n. 3(A)(i). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a *potential* result of the offense." *Id.* cmt. n. 3(A)(iv) (emphasis added). "[T]he determination of loss attributable to a fraud scheme is a fac-

tual issue for resolution by the district court, and we review such a finding of fact only for clear error." *United States v. Godwin*, 272 F.3d 659, 671 (4th Cir. 2001).

"In calculating fraud loss, a sentencing court must first apply the principles of 'relevant conduct.'" *United States v. Bolden*, 325 F.3d 471, 498 (4th Cir. 2003). A defendant charged with participating in a conspiracy can be held accountable only for the reasonably foreseeable acts of others that are taken in pursuit of the criminal activity he agreed to join. *See United States v. Gilliam*, 987 F.2d 1009, 1012-13 (4th Cir. 1993). "A defendant's membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action. Withdrawal must be shown by evidence that the defendant acted to defeat or disavow the purposes of the conspiracy."[4] *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989).

Regarding the scope of the conspiracy, the district court found that Allmendinger "agreed to a scheme and artifice to defraud, and he orchestrated it. He was one of the principal architects of it." J.A. 2301. The court found that the scheme and artifice to defraud "was to make abundant misrepresentations to people to secure their money, to use, as he saw fit, in his company." J.A. 2301-02. The court found that Allmendinger agreed with his co-conspirators to lie in a variety of ways, including about

> the structure and size and soundness of the company, the extent of its reach, and the kind of activities in which it engaged, the kind of success it had had, the yields that it had had, and [Allmendinger agreed] to perpetuate these lies by written communications in documents that were distributed with his auspices and approvals, as well as by emails and other electronic communications, and to structure it in such a

---

[4]Allmendinger does not argue that he satisfied this standard.

> way that he could treat the money in A&O as his personal piggy bank.

J.A. 2302. The court also found that Allmendinger knew that, even after the "sale" of the business, Abdulwahab was going to continue working there and the mode of operation that Allmendinger had set in motion would continue.

The court further noted that Allmendinger's scheme included telling the investors that their money would be in escrow or that A&O would prepay the premiums, when in actuality the money was not placed in escrow and the company paid the premiums only as they became due. The court observed that in such a situation it was reasonably foreseeable that money might not be available when it was needed and that the premiums would not be paid. The court added that "when you are operating a business that is based on fraud, you are charged with the knowledge that you potentially put at risk everybody's money that you've got and you've stolen and inveigled them to part with." J.A. 2304. Given this fact, the court concluded that the victims' losses were reasonably foreseeable as a potential result of Allmendinger's offense. We can find no flaw with the district court's analysis.

Allmendinger argues that at the time he left A&O, premiums for all life insurance policies were current. He relies on testimony from his forensic accountant stating that on the date Allmendinger left, A&O had funds sufficient to pay the premiums and that had the PCI reinsurance bonds paid out as anticipated, the investors would not have lost any money and in fact would have received a substantial return on their investment. He contends that the district court erred in holding him responsible for all that happened at the company after he left, including the withdrawal of millions of dollars by the company's principals and the decision to allow the policies to lapse. Allmendinger also contends the court erred in holding him responsible for the failure of PCI's bonds. We do not agree.

As the district court found, Allmendinger built a business permeated by fraud in which the principals, instead of paying the premiums immediately or putting the money in escrow, placed them in an account that they used as their own piggy bank. Of course, the very reason that the principals lied about this system is that if the investors knew the truth, they would know that the premiums would actually be paid only if the money was available when the premiums became due and the fraudsters handling the money decided to use it to pay the premiums. Not only was it reasonably foreseeable that the premiums might never be paid under this system, but hiding this potentiality was the whole point of the co-conspirators' lies that they were prepaying the premiums.

Nor did the district court clearly err by including in the loss amount losses to which the failure of the PCI bonds contributed. Allmendinger helped create a scheme by which people were deceived into entrusting their money to A&O on the false pretense that the company had an incredible record of protecting its investors' principal while earning hundreds of millions of dollars in double-digit returns. The allure of such a record of success is obvious: It is one thing to have created what *in theory* might seem like a recipe for success, and quite another to have tested that formula and been able to produce the intended results time and again. By lying to would-be investors about A&O's record, Allmendinger deceived them into believing that A&O had built a time-tested money-making machine, when in fact, investors were assuming the risk that Allmendinger's money-making plan would fail to work as intended. That A&O's bond holder, PCI, turned out, like A&O, to be a complete fraud is just the sort of "kink" that Allmendinger's lies lulled investors into believing would have been worked out had A&O truly had the experience and record that Allmendinger and his coconspirators claimed it did.[5]

---

[5]This connection between the fraud at issue and the third-party criminal conduct distinguishes this case from *United States v. Hicks*, 217 F.3d 1038

Thus, we hold the district court did not clearly err in including in Allmendinger's loss the amounts that were caused in part by PCI's default. *See United States v. Jimenez*, 513 F.3d 62, 87-88 (3d Cir. 2008) ("It is not appropriate to reduce the amount of the loss, as computed under the Guidelines, in order to reflect other causes of the loss which were beyond the defendant's control." (internal quotation marks omitted)).

Nevertheless, in a case in which the actual loss caused by the defendant's fraud has other causes more proximate than the fraud, a discretionary downward departure or a variance sentence may be appropriate. *See id.* at 88; *United States v. Kopp*, 951 F.2d 521, 531 (3d Cir. 1991). Allmendinger argues that the district court erred in failing to realize that it had authority to consider a downward departure under the Guidelines on the basis that the loss amount overstated the seriousness of Allmendinger's offense conduct. However, when a district court imposes a below-Guidelines sentence via variance, as the court did here, it is of no legal significance that the court may not have recognized that it also could have achieved a below-Guidelines sentence via departure. *See United States v. Diosdado-Star*, 630 F.3d 359, 364-65 (4th Cir. 2011).

---

(9th Cir. 2000), on which Allmendinger relies. In that case the defendant fraudulently obtained bank loans by submitting fake tax returns. *See id.* at 1041. The defendant maintained that after he defaulted and his fraud was discovered, the person the bank hired to sell the properties in foreclosure engaged in criminal misconduct that caused the properties to be sold at unreasonably low prices. *See id.* at 1047. The district court declined to hear evidence on the issue in determining the amount of loss, and on appeal the Ninth Circuit vacated the sentence imposed, holding that "[n]ew losses inflicted independently by third-party criminals after the completion and discovery of a defendant's crime do not 'result from' that crime for purposes of [§ 2F1.1 of] the Sentencing Guidelines, even if the defendant's conduct in some coincidental way was a but-for cause of the ultimate loss." *Id.* at 1048.

2.

Allmendinger also maintains that his sentence was procedurally unreasonable because the district court failed to address Allmendinger's argument that his sentence created an unwarranted disparity with those of similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6) (providing that in deciding an appropriate sentence, a district court must consider several factors, including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). We disagree.

Although sentencing courts are statutorily required to state their reasons for imposing a particular sentence, *see* 18 U.S.C.A. § 3553(c), it is not necessary that a court issue a comprehensive, detailed opinion. *See Rita v. United States*, 551 U.S. 338, 356 (2007). Rather, the explanation given must be sufficient "to satisfy the appellate court that [the district court] has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." *Id.*; *see United States v. Boulware*, 604 F.3d 832, 837 (4th Cir. 2010). Thus, a court is not required to discuss each § 3553(a) factor extensively, but need only "provide a rationale tailored to the particular case at hand and adequate to permit meaningful appellate review." *United States v. Carter*, 564 F.3d 325, 330 (4th Cir. 2009) (internal quotation marks omitted).

Here, the district court heard extensive argument from Allmendinger and the government concerning the extent to which Allmendinger was similarly situated to his co-conspirator Oncale. The district court's lengthy explanation for the sentence imposed left no doubt regarding the court's reasons for selecting the particular sentence that it did. Indeed, the court specifically noted that it was considering unwarranted disparities both among defendants in general and among co-defendants within the case. We therefore conclude

that the district court's explanation satisfied the requisite standard.

## B.

Allmendinger finally argues that his sentence was substantively unreasonable because it was significantly higher than sentences imposed on similarly situated defendants. He specifically compares his sentence to the 10-year sentence received by Oncale in this case and to similar sentences imposed nationwide on defendants involved in similar fraud schemes. We find no error.

The co-conspirators in this case were all eventually convicted, and they received a wide range of sentences: Abdulwahab, 60 years; Oncale, 10 years; Mackert, 188 months; and White, five years. As for the two co-conspirators most similarly situated to Allmendinger, Allmendinger received a sentence shorter than Abdulwahab's but much longer than Oncale's.

Oncale and Allmendinger were situated differently in that Oncale was confronted by the government early in the investigation and admitted to his culpability and immediately agreed to plead guilty. He liquidated his assets and gave the money to the government, and he cooperated extensively with the government, including by pleading guilty. Allmendinger, on the other hand, refused to accept responsibility for his actions when confronted by the government. He instead sought to squirrel away cash with his father in anticipation of his indictment and continued to live a lavish lifestyle with this money. He also hid money in violation of the restraining order and attempted to flee just days before the trial. And he eventually proceeded to trial, failing to accept responsibility.

Because Oncale cooperated with the government, he was allowed to plead guilty to one count of conspiracy to commit mail fraud and one count of conspiracy to commit money

laundering, each of which carried a maximum sentence of five years' imprisonment. We are not entitled to second guess the government's exercise of its prosecutorial discretion absent a showing of invidious discrimination by the government, *see United States v. Batchelder*, 442 U.S. 114, 124-26 & n.9 (1979), and Allmendinger does not allege such discrimination. The district court simply was not required, in the name of avoiding unwarranted sentencing disparity, to treat Allmendinger as if he had been convicted only of the crimes to which Oncale pled guilty. *See United States v. Duncan*, 479 F.3d 924, 928 (7th Cir. 2007) (per curiam).

Allmendinger also argues that his sentence was unreasonable in light of the sentences handed down throughout the country for comparable crimes. Again we disagree. Allmendinger's crimes involved frauds of unthinkable scope that financially devastated hundreds of people. Indeed, victim impact testimony established the crushing effect that the conspiracy had on many people's lives. There is certainly precedent for imposing a comparably stiff sentence for a fraudulent scheme of this magnitude. *See, e.g.*, *United States v. Lewis*, 594 F.3d 1270, 1277-78 (10th Cir. 2010) (affirming 310–year sentence for a defendant convicted by a jury of an investment fraud of over $40 million dollars). We conclude that the court was within its discretion in sentencing Allmendinger as it did.

IV.

In sum, finding no error, we affirm Allmendinger's convictions and sentence.

*AFFIRMED*