Certiorari granted by Supreme Court, June 30, 2022
Vacated and remanded by Supreme Court, June 30, 2022

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 20-4133**

―――――――――――

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

GEORGE P. NAUM, III,

        Defendant - Appellant.

―――――――――――

Appeal from the United States District Court for the Northern District of West Virginia, at Clarksburg.  Irene M. Keeley, Senior District Judge.  (1:18-cr-00001-IMK-MJA-2)

―――――――――――

Submitted:  September 10, 2020                 Decided:  October 13, 2020

―――――――――――

Before MOTZ, HARRIS, and QUATTLEBAUM, Circuit Judges.

―――――――――――

Affirmed by unpublished per curiam opinion.

―――――――――――

Elgine H. McArdle, MCARDLE LAW OFFICES, Wheeling, West Virginia, for Appellant. William J. Powell, United States Attorney, Wheeling, West Virginia, Sarah E. Wagner, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.

―――――――――――

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

George P. Naum, III, appeals from his convictions and sentence following his jury trial. Naum was convicted of conspiracy to distribute suboxone outside the bounds of professional medical practice between 2008 and 2016, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, and four counts of aiding and abetting the distribution of suboxone outside the bounds of professional medical practice in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2. The district court sentenced Naum to six months incarceration followed by six months of home detention. In addition, the district court imposed a forfeiture order of $77,063.00. After careful consideration of Naum's numerous claims on appeal, we affirm.

I.

These charges arose from Naum's involvement in a Weirton, West Virginia suboxone clinic known as Advance Healthcare ("Advance"), which was owned and operated by Sharon Jackson and co-defendant Eric Drake, and which also employed co-defendant Dr. Felix Brizuela. The evidence at trial viewed in the light most favorable to the Government was as follows.

Advance was a suboxone clinic that offered its patients office-based addiction treatment. Jackson, a registered nurse, and Drake, an individual with no medical training, ran the day-to-day operations of Advance. Advance employed Naum and Brizuela, who were both authorized to prescribe suboxone to treat drug addiction. Naum and Brizuela were scheduled to be at Advance just one evening each a week, and when they were not present, Jackson used their authority pursuant to their "DEA numbers" to issue prescriptions for suboxone to Advance's patients.

2

Naum and Brizuela allowed Jackson nearly unfettered use of their DEA numbers, delegated most of the patient care to Jackson, and frequently missed all or part of their once-a-week assigned shifts at Advance. In fact, during a two-month period in 2016, footage from a pole camera placed by investigators outside the clinic revealed that Naum was present at Advance only 13.9% of the time that it was open to patients and prescriptions for suboxone were being issued from it. Jackson testified that she could not have treated patients without the doctors' DEA numbers.

When they were present in the office, the doctors reviewed and signed off on patient charts and saw new patients. New patients were given drug screens, filled out paperwork, met with Jackson, and met with a physician if one were present. If a physician met with the patient, he told Jackson what beginning dose of suboxone to start the patient on, and she communicated the prescription to the pharmacy. If no physician was present at the initial visit, Jackson diagnosed the patient with an opioid use disorder, decided on a daily dose of suboxone, and called in the prescription using one of the doctors' DEA numbers

Jackson and Drake both testified that they had verbal agreements with Naum and Brizuela permitting Jackson to issue prescriptions under their DEA numbers to new patients who had not seen a physician, so long as she did not prescribe more than 16 milligrams per day. If she conducted the entire initial visit, Jackson scheduled the patient to come back to see one of the physicians. As a policy, Naum and Brizuela generally only saw patients on the initial visit or one visit early on in their treatment. Follow-up visits were generally only with Jackson.

3

In addition to making dosing decisions for new patients who had not been seen by a physician, Jackson had blanket permission from Naum and Brizuela to wean or decrease patients' doses. Naum often wrote instructions in each patient's medical chart to either maintain or decrease a patient's dose, but Jackson had Naum's permission to disregard those written instructions based on the conversations she was having with patients. Naum never confronted Jackson about overriding his written instructions by prescribing different doses to his patients.

The Government's expert, Dr. Patrick Marshalek, testified about medical standards to which physicians who prescribe controlled substances to treat addiction must adhere. He testified that many of those standards were promulgated by the Substance Abuse and Mental Health Services Administration (SAMHSA). Marshalek testified that physicians must maintain an ongoing relationship with patients to whom they prescribe controlled substances that extends beyond the initial examination and diagnosis. There is a time after which a doctor-patient relationship expires and must be renewed by another face-to-face visit in order to continue issuing prescriptions for controlled substances. Marshalek testified that the rules of the West Virginia Board of Osteopathic Medicine (WVBOM)[1] require physicians to make an in-person examination of patients to whom they are prescribing controlled substances no less than once every six months for the duration of their treatment. *See* W. Va. C.S.R. § 24-1-18.2.a.5.

---

[1] The WVBOM oversees the licensing of osteopathic physicians like Naum and Brizuela in West Virginia.

4

The WVBOM also prohibits physicians from delegating responsibilities to others who are not qualified to carry them out. *See* W. Va. C.S.R. § 24-1-18.1.aa. Marshalek testified that physicians who prescribe controlled substances to patients may not delegate their prescriptive authority to others who do not themselves have such authority. Physicians may not delegate the decision as to dose or medication to a nurse, and they may not authorize nurses to override their instructions as to dosages or medication. Physicians must also evaluate patients' continued need for medication in an ongoing manner. The prohibition against delegating the responsibility to prescribe suboxone to non-authorized individuals, including nurses, is expressly explained in the SAMHSA Guidelines. Marshalek also testified that it is the physician, and not a nurse, who must diagnose a patient with an opioid use disorder. Marshalek reviewed the charts of the patients who received the prescriptions charged in the indictment and opined that each prescription was issued outside the bounds of medicine.

The Government also introduced the testimony of Cpl. J.W. Smith, who in an undercover capacity, posed as a patient at Advance, as well as various actual patients. These witnesses testified to either brief examinations by Naum or no examination at all. Some patients had never met with Naum and/or did not realize he was their doctor. In addition, there were instances where Jackson weaned the patient where Naum instructed Jackson to continue the present dose or continued the present dose when Naum instructed her to wean. On those occasions, Naum signed off on the deviated course after the fact.

5

The court sentenced Naum to a period of six months incarceration followed by six months of home detention. Although the forfeiture allegation in the indictment was for the entire amount of Naum's earnings from Advance during the course of the conspiracy, the Government at sentencing requested forfeiture of $157,719.52, or 51.9% of Naum's entire salary of $303,891.17. The Government's calculations were based on the percentage of "illegitimate"[2] prescriptions authorized by Naum's DEA number for all of Naum's patients at the time of the seizure of records, as well as the patients who testified at trial.

The district court concluded that a reasonable calculation of Naum's criminal proceeds, based upon a preponderance of the evidence, was $77,063.00. The district court reached that amount by multiplying Naum's salary from 2013 to 2016 by 51.9%, the percentage of illegitimate prescriptions issued by Naum to the 60 patients. In doing so, the district court sustained Naum's objection that the trial evidence covered only 2013 through 2016, and not the entire period charged in the indictment as the Government had requested.

II.

Naum sought to testify that he believed 42 C.F.R. § 8.12, entitled "Federal opioid treatments standards," applied to his practice of medicine. He asserts that the regulation was relevant to his "good faith defense." The district court ruled that this regulation did not apply to Naum, and thus, any belief that it was applicable was an improper ignorance-of-the-law defense. On appeal, Naum argues that the district court erred by

---

[2] Prescriptions were considered illegitimate if they were issued without Naum examining the patient or were issued more than six months after Naum examined the patient.

6

determining that 42 C.F.R. § 8.12 was not the applicable federal standard for opiate addiction treatment.

The regulation cited by Naum is contained in a subpart entitled "Certification and Treatment Standards for Opioid Treatment Programs" ("OTP"). OTPs are defined as programs or practitioners engaged in opioid treatment that are registered under 21 U.S.C. § 823(g)(1). *See* 42 C.F.R. § 8.2. Naum, however, was registered under the DATA-waiver provision of 21 U.S.C. § 823(g)(2),[3] and neither he nor Advance was separately registered under 21 U.S.C. § 823(g)(1). Consequently, neither meets the definition of an OTP.

Naum does not identify specific subparts of § 8.12 that support his purported good faith defense. However, the text of § 8.12 makes it evident that it applies to OTPs and not to DATA-waived practitioners like Naum. First, both the terms "OTP" and "practitioner" are explicitly defined in the regulation, and those definitions are tied to which subpart of 21 U.S.C. § 823(g) an individual or entity is registered under. *See* 42 C.F.R. § 8.2 ("Opioid treatment program or 'OTP' means a program or practitioner . . . registered under 21 U.S.C. § 823(g)(1). . . . Practitioner means a physician . . . who possesses a waiver under 21 U.S.C. § 823(g)(2)."). Section 8.12 references, in nearly every provision, the term "opioid treatment program" or "OTP" and does not include "practitioners."

Nonetheless, Naum contends that § 8.12 must apply to practitioners as well because it is the only federal standard that exists for opioid treatment physicians and the federal Government has pre-empted this area of the law. Naum contends that he was prevented

---

[3] DATA 2000 is an acronym for the Drug Addiction Treatment Act of 2000.

from presenting evidence that his conduct was permitted under the applicable federal regulations. He asserts that "nothing in 42 C.F.R. § 8.12 nor any regulation prohibits a physician from delegating monitoring compliance with the treatment protocol to a registered nurse—as Dr. Naum did in this case." (Appellant's Br. (ECF No. 15) at 23). However, contrary to Naum's argument, the evidence actually showed that Naum delegated his prescriptive authority, not compliance monitoring. This conduct is squarely at odds with federal laws and regulations, including those applicable only to OTPs. *See* 21 U.S.C. § 841(a) (prohibiting distribution of controlled substances "except as authorized"); 21 U.S.C. § 822(b) (permitting certain medical professionals to become authorized); 21 C.F.R. § 1306.04(a) (only a "practitioner" can issue prescriptions); *see also United States v. Joseph,* 709 F.3d 1082, 1104 (11th Cir. 2013) (a physician's delivery of a prescription without conducting any physical examination of the patient provides strong evidence to support a conviction).

At best, Naum was mistaken about the law. But, as the district court noted, a mistaken belief about the law is not a defense, not even a defense of good faith. That is particularly true here where the regulations Naum cited, by their express terms, do not apply to Naum or his practice. Further, as the government argues, the introduction of evidence about a regulation that did not apply to Naum or his practice created a reasonable risk of confusing the jury. *See* Fed. R. Evid. 403. Accordingly, we conclude that the district court did not abuse its discretion in prohibiting evidence of federal regulations that neither applied to Naum nor were relevant to the issues before the jury.

III.

Next, Naum contends that the district court abused its discretion in prohibiting him from presenting evidence that his treatment of patients was for a legitimate medical purpose and not for some other purpose, such as drug diversion. The Supreme Court held in *United States v. Moore*, 423 U.S. 122, 124 (1975), "that registered physicians can be prosecuted under § 841 when their activities fall outside the usual course of professional practice." We have noted that there are no specific guidelines concerning whether a physician acts outside the usual course of professional practice and that a case-by-case analysis of evidence is required to determine whether a reasonable inference of guilt may be drawn from specific facts. *United States v. Singh*, 54 F.3d 1182, 1187 (4th Cir. 1995). The Government may meet its burden by establishing that the physician's actions were not for legitimate medical purposes in the usual course of professional medical practice *or* were beyond the bounds of professional medical practice. *Id.*; *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1141 (4th Cir. 1994). The Government is not required to prove both prongs (i.e. no legitimate purpose *and* beyond professional bounds), and therefore, there was no error in permitting the Government to proceed only on the theory that Naum's actions were beyond the bounds of professional medical practice. *See Singh,* 54 F.3d at 1188 ("In sum, although the testimony does not adduce compelling evidence that Dr. Singh prescribed with malicious motive or the desire to make a profit, those motivations, though common in § 841(a)(1) prosecutions, are not required to convict").

Because the issue of whether Naum's treatment was for a legitimate medical purpose was not an element in this case, Naum's contention that he acted with a legitimate

9

medical purpose was not a viable defense. In fact, there was no dispute at trial that Naum's patients suffered from addiction and required treatment. As such, the district court did not abuse its discretion in prohibiting evidence regarding the medical purposes of Naum's treatment.

## IV.

Naum next contends that the Government improperly altered the definition of "outside the usual course of professional practice" such that Naum was convicted of different crimes than the ones for which he was indicted. A fatal variance—also known as a constructive amendment—occurs when the Government (through argument or presentation of the evidence) or the district court (through jury instructions) "broadens the bases for conviction beyond those charged in the indictment," effectively amending the indictment to allow the defendant to be convicted of a crime other than the one charged, in violation of his Fifth Amendment right to be tried only on the charges made by the grand jury in the indictment. *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999). A constructive amendment is error per se, and it must be corrected on appeal. *Id.* (citing *United States v. Floresca*, 38 F.3d 706, 712-13 (4th Cir. 1994) (en banc)). However, divergence between the charges and the Government's proof is not automatically a constructive amendment or fatal variance; when the facts proven at trial support a finding that the defendant committed the charged crime, and the allegations in the indictment differ in some way not essential to that conclusion, a mere non-fatal variance occurs. *See United States v. Miltier*, 882 F.3d 81, 93 (4th Cir.), *cert. denied*, 139 S. Ct. 130 (2018); *United States v. Allmendinger*, 706 F.3d 330, 339 (4th Cir. 2013). A variance violates the

10

defendant's Fifth Amendment rights only if it prejudices him by surprising him at trial and hindering his defense, "or by exposing him to the danger of a second prosecution for the same offense." *Allmendinger*, 706 F.3d at 339 (internal quotation marks omitted).

Naum was indicted for a conspiracy to "engage in the business of unlawful[l]y, knowingly, and intentionally distributing and causing to be distributed controlled substances without a legitimate medical purpose and outside the usual course of professional practice" and for aiding and abetting the distribution of suboxone "without a legitimate purpose and outside the usual bounds of professional practice." (J.A. 35, 41). First, the district court's disjunctive instruction (instructing only regarding outside the course of professional practice and not on legitimate medical purpose) does not broaden the possible bases for conviction or change the elements of the charged crimes, since (as discussed above) the applicable law is disjunctive. Thus, even though the indictment charges in the conjunctive, the court's disjunctive instruction did not result in a constructive amendment to the indictment. *See United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009).

Second, the indictment further charges that Naum permitted Jackson to administer and dispense opioid addiction treatment medications to patients without proper supervision. The indictment detailed the procedures at Advance, including that Naum did not regularly see patients and that he signed off on treatment after the fact. Naum does not allege that these allegations differed from the evidence at trial or that he was not convicted of distributing suboxone outside the bounds or course of professional practice, as charged.

11

Therefore, Naum was not subjected to a fatal variance, and the district court did not err in denying his Rule 29 motion for judgment of acquittal.

V.

Naum next asserts that the district court committed plain error in instructing the jury regarding the definition of "outside the bounds of professional practice." Specifically, the district court informed the jury that certain types of evidence can support such a finding, including prescribing suboxone with only a superficial examination, without an authorized person taking a medical history, and without a doctor-patient relationship; allowing unauthorized individuals to diagnose an opioid use disorder or prescribe medication; and violating an applicable professional regulation. Naum contends that the Government implied that Naum had violated two provisions of the WVBOM standards: (1) improperly delegating prescription authority and (2) failing to conduct an in person examination within six months. Naum then appears to argue that this evidence/argument, combined with the jury instructions, rendered the violation of WVBOM a strict liability federal offense or permitted Naum to be found guilty upon only a showing of malpractice.

A jury instruction is not erroneous if, "in light of the whole record, [it] adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *Miltier*, 882 F.3d at 89. In reviewing a challenge to the jury instructions, we do not "view a single instruction in isolation," but instead "consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *United States v. Blankenship*, 846 F.3d 663, 670-71 (4th Cir. 2017) (internal quotation marks omitted).

12

We conclude that the district court did not plainly err in instructing the jury. First, the district court's initial instructions on the three elements of the offense matched our description of the offense elements. *See United States v. Hurwitz*, 459 F.3d 463, 475 (4th Cir. 2006) ("[T]o convict a doctor for violating § 841, the government must prove: (1) that the defendant distributed or dispensed a controlled substance; (2) that the defendant acted knowingly and intentionally; and (3) that the defendant's actions were not for legitimate medical purposes in the usual course of his professional medical practice or were beyond the bounds of medical practice." (internal quotation marks omitted)); (J.A. 2926-27). The court's instruction that the jury must consider the totality of the circumstances in making its determination that Naum acted outside the scope of professional medical practice was consistent with this our precedents. *See Singh*, 54 F.3d at 1187; *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1137-38 (4th Cir. 1994); (J.A. 2930) ("[Y]ou should examine all of his actions and the facts and circumstances in the case.").

Although Naum faults the district court for giving a list of examples of conduct that demonstrate a physician acted illegitimately, the court cautioned that its list was illustrative, not exhaustive. Indeed, the court stated explicitly that the "violation of an applicable professional regulation alone, however, is not determinative." (J.A. 2931). Moreover, the instructions correctly listed factors accepted as relevant by courts on this issue. *See, e.g., Moore,* 423 U.S. at 142-43 (giving inadequate physical exam); *United States v. McIver,* 470 F.3d 550, 560 (4th Cir. 2006) (violation of professional regulations). Accordingly, there was no plain error in the jury instructions.

VI.

13

Naum asserts that the forfeiture order was improper because the patient sampling used was arbitrary and the underlying evidence was not presented to the jury. In addition, Naum contends that the district court considered certain prescriptions illegitimate even though they complied with the West Virginia regulations in effect at the time or were written on a day Jackson consulted with Naum prior to issuing the prescriptions. Finally, Naum contends that the district court did not properly explain its judgment.

"Criminal forfeiture is part of a defendant's sentence." *United States v. Martin*, 662 F.3d 301, 306 (4th Cir. 2011). Rule 32.2 of the Federal Rules of Criminal Procedure sets forth the procedure used to effect criminal forfeiture. *Id.* at 306-07. "After conviction, the government must establish a nexus between the property for which it is seeking forfeiture and the crime by a preponderance of the evidence." *Id.* at 307. When the Government seeks a money judgment, the court must determine the amount the defendant will be ordered to pay, based on evidence already in the record or additional evidence submitted by the parties and accepted as reliable. Fed. R. Crim. P. 32.2(b)(1)(B).

In this case, the district court entered a forfeiture money judgment of $77,063.20. This amount constituted 51.9% of the income Naum obtained from Advance from 2013 to 2016. The district court found that Naum's salary—or at least a portion of it—constituted proceeds of his crime. The district court also found that taking 51.9% of Naum's salary from 2013 to 2016 was "a reasonable approach" because it was "based on not a sampling, but on a real calculation" of Naum's prescriptions. (J.A. 3394). The district court explicitly addressed Naum's arguments at sentencing and provided appropriate reasoning.

14

Moreover, the district court's findings regarding the forfeiture money judgment are supported by reasonable and reliable evidence, and Naum has not demonstrated that those findings are clearly erroneous or that the court's ultimate findings were not based on the preponderance of the evidence. The facts that Naum was occasionally present and discussed patients with Jackson on the days he was in the office are irrelevant, given that the determination of illegitimacy of each prescription was based upon Naum not personally examining the patient. The evidence at trial supported the conclusion that the lack of a personal examination was relevant and probative as to whether Naum's actions were appropriate.

Naum contends that the use of the 60 charts in arriving at the percentage of his ill-gained proceeds was statistically unsound. However, the basis for the selection of the 60 patient files was well-explained both in the Government's pre-sentence pleadings and at the sentencing hearing. Naum's characterization of the selection of those 60 patient files as "random" is patently incorrect. The 60 charts were 100% of the patients that Naum was treating at the time of the DEA seizure and two former patients who were discussed at length at Naum's trial. Thus, Naum's arguments about random sampling are irrelevant.

Finally, Naum complains that certain prescriptions were included in the calculation which predated the July 1, 2012 enactment of W. Va. C.S.R. § 24-1-18.2.a.5, which included the requirement that prescriptions must be written within six months of an examination. While it is correct that there were prescriptions issued prior to July 2012 included in the calculations, the Government alleges that removing both categories of prescriptions that predated July 2012—the legitimate and the illegitimate—from the

15

calculation would not change the percentage of illegitimate prescriptions. Naum does not dispute this calculation. Moreover, while the Government chose the six-month requirement as a touchstone for legitimate/illegitimate prescriptions, such was a conservative choice, because the state regulations were just one factor in determining the legitimacy of prescriptions, and the evidence at trial clearly showed that, even when Naum conducted an examination, it was often perfunctory. In addition, the district court only included the portion of Naum's salaries received during an approximately 3-year period, even though there was no evidence showing that Naum's actions were any less illegitimate outside this time period. Because the district court's forfeiture determination was based on an application of the law to facts which were well-supported by reasonable and reliable evidence, we affirm the forfeiture order.

## VII.

In his reply brief, Naum raises new claims based on Brizuela's appeal, which was decided after Naum filed his opening brief. *See United States v. Brizuela,* 962 F.3d 784 (4th Cir. 2020) (published, but not argued). The Government responded with a Fed. R. App. P. 28(j) filing of supplemental authorities addressing *Brizuela*, and Naum filed a reply averring that the Government's filing was an improper sur-reply and should be ignored. Brizuela was tried on distribution charges unconnected to Naum and Advance. We reversed Brizuela's convictions, finding that the testimony of four patients, whose treatment was not the basis for any charges, was improperly admitted. 962 F.3d at 795-99.

Naum first contends that insufficient evidence supports his conspiracy conviction because the Government failed to present evidence of prescriptions he wrote prior to 2014.

*Brizuela* held that, in a prosecution for dispensing improper prescriptions, other similar, but uncharged, criminal behavior was "overkill" or "piling on." *Id.* at 796. *Brizuela* is irrelevant to Naum's argument for several reasons. First, Naum was convicted of conspiracy; Brizuela was not. As such, evidence necessary to "complete the story" of the underlying crime was necessarily broader. *Id.* at 794-95. Second, Brizuela did not challenge the sufficiency of the evidence supporting his conviction, and *Brizuela* did not announce any new relevant law. Thus, Naum's claim could have been raised in his opening brief. Third, while *Brizuela* noted that unlawful distribution is charged by citing to a specific prescription, *id.* at 795, Naum's indictment did just this. Naum's current complaint that the indictment charged a conspiracy that began in 2008, but did not present evidence of Naum's improper prescriptions prior to 2014, is entirely untethered to *Brizuela,* and the parties recognized at sentencing that the evidence at trial concerned actions between 2013 and 2016.

Next, Naum asserts that, based on *Brizuela,* evidence of Brizuela's and Jackson's actions were improperly admitted against Naum on the conspiracy charge. Specifically, he cites to evidence at his trial that Brizuela examined and prescribed drugs to a patient who was then transferred to Naum and that Jackson disregarded Naum's instructions. Again, *Brizuela*'s holding is irrelevant to a conspiracy count. Moreover, the "evidence" Naum cites to was relevant to the charges against him and, actually, beneficial to Naum. Specifically, the Government presented evidence that Brizuela examined and prescribed drugs to a patient, subsequently transferred to Naum who continued prescriptions without ever examining the patient. The evidence that the patient was examined by a licensed

17

professional was not prejudicial to Naum.  Further, the evidence that Jackson disregarded Naum's instructions came from Naum himself.  Jackson, on the other hand, testified that she had blanket authority to alter Naum's instructions.  Accordingly, Naum's arguments based on *Brizuela* are without merit.

As such, we affirm the district court's judgment.  We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*